IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT DARNELL BEAL,<br><br>Defendant. | Case No. 18-cr-00070-DKW-12<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND GRANTING DEFENDANT'S REQUEST FOR SEVERANCE** |

Before the Court are two motions.  First, Defendant Robert Darnell Beal seeks to suppress drug evidence found in the backseat of a taxi in which he was traveling in Dayton, Ohio, as well as statements he made to law enforcement on December 10, 2014 and September 25, 2019.  Beal argues that the Ohio State Highway Patrol's traffic stop of the taxi that resulted in the discovery of drugs was unlawful and that statements made to law enforcement on both dates were elicited in violation of the Supreme Court's *Miranda* jurisprudence.  The Government argues that, due to ongoing wiretap and other surveillance operations, it had, at a minimum, reasonable suspicion to initiate the traffic stop of Beal's taxi on December 10, 2014 and that it never elicited statements from Beal in violation of *Miranda*.  For the reasons set forth below, the Court agrees with the Government, and the motion to suppress evidence and statements is DENIED.

Second, Beal appeals the Magistrate Judge's decision denying his motion to sever. Beal argues the trial delays due to the COVID-19 pandemic and attendant to being party to a multi-defendant drug conspiracy case, as well as his significant pretrial detention and limited role in the alleged conspiracy warrant severance and a prompt trial. The Government disagrees. For the reasons articulated below, the Court agrees with Beal and the order denying severance is hereby OVERRULED. The Court will proceed with a trial of this case against Beal alone on the currently scheduled date of June 21, 2021.

## RELEVANT BACKGROUND

Based upon the testimony provided at an April 29, 2021 suppression hearing and exhibits entered into evidence at that hearing, the Court makes the following findings of fact.

## I.    The Investigation Leading up to the December 10, 2014 Traffic Stop

Prior to December 10, 2014, the Federal Bureau of Investigation ("FBI"), through wiretap surveillance, learned that co-Defendant Vaitaki Manoa would be traveling from the Bay Area to Dayton International Airport to deliver illegal narcotics to a courier named "Oso." Oso was described as a large black male wearing either a red jacket or black vest.[1]

---

[1]Ohio State Highway Patrol Officer Rachel Simmons' and FBI Special Agent Edwin Nam's descriptions of Oso's clothing differ.

Acting on this information, the FBI, partnering with the Drug Enforcement Administration and the Ohio State Police, established a surveillance operation in and around the Dayton airport.   On December 10, 2014, as the FBI continued to feed real-time information from its wiretaps to the joint effort, law enforcement officers observed Manoa carrying a black backpack as he arrived at the airport. Law enforcement officers on the ground were able to identify Manoa because he wore a distinctive Green Bay Packers jacket, just as the wiretaps said he would be. Officers also identified Manoa's co-conspirator—the individual the wiretaps only identified as "Oso"—not only based on the physical and clothing descriptions revealed in the wiretaps, but also based on what happened next.

Although Manoa and Oso were, according to the wiretaps, supposed to meet, one or both of them was reluctant to do so at the airport itself due to suspected surveillance.  As a result, Manoa and Oso decided to move their meet-up to an offsite location.   The FBI initially learned this through the wiretaps, with Manoa apparently on his cellular phone with co-Defendant Pongitini Latu Fonua and Oso on his cellular phone with his handler identified only as "Chelz."  Oso reported by phone that he would be leaving the airport in a green Dodge minivan taxi, and when the FBI wiretap monitors immediately reported that description to law enforcement in Ohio, they were able to easily follow that taxi as it left the airport with a single passenger subsequently identified as Defendant Beal.

After leaving the Dayton airport, Manoa went to the Airport Inn, while Beal initially went to a nearby Travelodge, just as law enforcement knew they would, based on the wiretap information that continued to be transmitted in real-time.  The FBI learned that Manoa and Oso were trying to locate each other to complete the drug transaction.[2]  After some time, Beal's taxi left the Travelodge and went to the Airport Inn.  Law enforcement observed Manoa approach Beal's taxi carrying a black backpack and, shortly thereafter, walk away empty-handed.

## II.    <u>December 10, 2014 Traffic Stop and Interview</u>

The information detailed above, including that the drug transaction had been completed, was provided to local law enforcement, including Ohio State Highway Patrol ("OSHP") Officer Rachel Simmons.  Officer Simmons was also provided with the make and license plate number of Beal's taxicab and instructed to stop the vehicle if she had reason to do so.  Officer Simmons observed the taxi exceed the posted speed limit and change lanes without signaling.  Thereafter, she initiated a stop of the vehicle.

After initiating the stop, Officer Simmons questioned the taxicab driver.  In doing so, Officer Simmons confirmed the details above—*i.e.*, that he had driven Beal from the airport to the Travelodge, then to the Airport Inn, where Beal met

---

[2]There is no evidence in the record that Beal himself sent or received any of the intercepted messages.

with another individual who gave Beal a black backpack.  When asking Beal to exit the taxi and to sit in the back of her patrol car, Officer Simmons noticed he seemed nervous: he was shaking, eyes wide, and licking his lips.  Beal also appeared to be texting from one of his two cellular phones.

OSHP K-9 Officer Michael Mahaffey arrived at the scene with a trained drug-sniffing dog.  With both Beal and the taxi driver out of the vehicle and temporarily placed in separate patrol cars, the K-9 conducted an open-air sniff around the taxi.  The dog did not alert to the presence of drugs.  Despite this, Officer Simmons still believed—based on the information detailed above—that there were narcotics in the vehicle.  Officers obtained consent from the driver to search the taxi and consent from Beal to search his red Tommy Hilfiger bag.  Beal was asked more than once which items in the taxi belonged to him.  His response was consistent: only the red Tommy Hilfiger bag was his.

Upon a search of the black backpack that was located in the back seat of the taxi next to where Beal had been sitting, Officer Simmons discovered two packages that appeared to contain illegal narcotics.[3]  At that time, Officer Simmons placed Beal under arrest and read him his *Miranda* rights.  Shortly thereafter, Beal was transported to the Dayton Patrol Post ("police station") for questioning and

---

[3]While a field test of the substance discovered in the black backpack was positive for cocaine, Officer Simmons avers that the test is not determinative and did not factor into the probable cause for Beal's subsequent arrest.

processing.  At the station, Beal was interviewed by OSHP Officer Penny Beaty. Beaty asked Beal if he had been advised of his rights and if he understood those rights.  Beal responded affirmatively, confirming that he had been advised of his rights and that he "totally" understood them.  Beaty's interview lasted between sixty and ninety minutes.  Thereafter, Beal was released.

## III.   September 25, 2019 Statements

On July 2, 2019, Beal was indicted, along with many others.  Dkt. No. 4. Following his arrest, he was interviewed by FBI Special Agent Joel Rudow on September 25, 2019.  Govt. Exh. 3.  Prior to advising Beal of his rights, Special Agent Rudow spent roughly fifteen minutes laying out the overall conspiracy and the specific evidence against Beal.  *Id.* at 10:52–11:07.  When Beal attempted to make a statement, Special Agent Rudow stopped him, and had him read and acknowledge his rights, before Beal consented to proceeding.  *See* Govt. Exh. 2 (Advice of Rights form signed by Beal).  Several times during the interview, Special Agent Rudow reminded Beal that while he had an opportunity to tell his story/answer questions, he was under no pressure and was not required to do so. The interview lasted roughly thirty minutes.  After the interview ended and during transport to the U.S. Marshal's Service, Beal made a further, potentially inculpatory statement to the FBI Special Agents in the transport vehicle.

## IV.    **Procedural Background**

On March 27, 2021, Beal filed a motion to suppress the drug evidence found in the black backpack of his taxi, as well as the various statements he made to law enforcement on December 10, 2014 and September 25, 2019.  Dkt. No. 307.  On April 6, 2021, Beal filed a motion appealing the Magistrate Judge's order denying severance.  Dkt. No. 316.  After both motions were fully briefed, *see* Dkt. Nos. 319, 321, 331, 338, the Court heard oral argument following an evidentiary hearing that included testimony from six witnesses on April 29, 2021.  Dkt. No. 344.  This order follows.

## LEGAL STANDARDS

## I.    **Fourth Amendment**

The Fourth Amendment to the United States Constitution establishes the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  To protect this right, courts apply an "exclusionary rule," whereby any evidence obtained in violation of the Fourth Amendment may not be used against the victim of the unlawful search or seizure.  *See United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016) ("Evidence derived from an illegal search cannot 'constitute proof against the victim of the search'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (citing *California v. Carney*, 471 U.S. 386, 390–91 (1985)).  There is, however, a well-established automobile exception to this general rule: "where there is probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually attained*." *Id. at* 466–67 (citing *State v. Ross*, 456 U.S. 798, 809 (1982) (internal quotation marks omitted) (emphasis in original)).  "Because this exception is justified by the exigency created by the inherent mobility of vehicles as well as the relatively minimal expectation of privacy that exists with respect to automobiles, the applicability of the automobile exception does not turn on whether the car's owner or driver has already been taken into custody or the risk of mobility has otherwise been eliminated." *United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012) (citations omitted).  Rather, if the vehicle is readily mobile and being used as a licensed motor vehicle, an immediate search of the vehicle may occur "so long as there is probable cause." *Id.*

"Probable cause to search is evaluated in light of the totality of the circumstances and is found to exist if there is a fair probability that contraband or other evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983); *accord Scott*, 705 F.3d at 417 ("In determining

whether probable cause exists, this court evaluates the totality of the circumstances.") (citation omitted).  Probable cause can be established by the "collective knowledge" of the law enforcement officers involved in an investigation.  *United States v. Jensen*, 425 F.3d 698, 704–05 (9th Cir. 2005). "The police may search an automobile *and the containers within it* where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991) (emphasis added).

"In order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *United States v. Paopao*, 469 F.3d 760, 764 (9th Cir. 2006) (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)) (internal quotation marks omitted).  An expectation of privacy is reasonable if it "has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Carter*, 525 U.S. at 88 (citations and internal quotation marks omitted).

## II.    <u>Fifth Amendment</u>

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V.  To protect this right, "[p]rior to any questioning [by law

enforcement, a] person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Such warnings are required only where a person is subjected to custodial interrogation. *Berkemer v. McCarthy*, 468 U.S. 420, 436 (1984).

Generally, a person detained as part of a traffic stop is not "in custody" for *Miranda* purposes. *Id.* at 440–42. Having a suspect sit in a police vehicle during such a stop does not, in all circumstances, render a suspect in custody. *United States v. Torres-Sanchez*, 83 F.2d 1123, 1127 (9th Cir. 1996) (citations and internal quotation marks omitted). "There is no bright line for determining when an investigatory stop crosses the line and becomes an arrest." *Id.* (citations and internal quotation marks omitted). In making a custody determination, a court must consider the totality of the circumstances to determine whether "a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981).

Even if *Miranda* warnings have not been given, statements volunteered to law enforcement after a suspect is taken into custody are admissible so long as they were not responsive to an interrogation. *See Rhode Island v. Innis*, 446 U.S. 291,

299–301 (1980).  "The term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

## DISCUSSION

### I.   Officers had Probable Cause to Stop and Search the Taxi

Beal makes three distinct arguments.  First, he contests Officer Simmons' assertion that she observed the taxi in which Beal was traveling exceed posted speed limits and change lanes without signaling.  Dkt. No. 307-2 at 2–3.  Second, he argues that even if the initial stop of Beal's taxi was justified based on perceived traffic violations, extending the stop to investigate not only the traffic violations but potential drug crimes was unlawful.  *Id.* at 3–6.  Finally, even if it was lawful to extend the traffic stop to allow a trained drug-sniffing dog to be utilized, the failure of that dog to alert to the presence of drugs in the vehicle dispelled any probable cause officers may have had to believe the vehicle contained drugs and, thus, vitiated any justification to detain Beal or to search the belongings that officers associated with him.  *Id.* at 6–7; Dkt. No. 331 at 3–6.  None of these arguments has merit.

Other than a conclusory disagreement with Officer Simmons' assertion that she observed Beal's taxi exceed posted speed limits by pacing it and further observed it change lanes without signaling, *see* Dkt. No. 307-2 at 2, the Court has no *evidence* contradicting those allegations.  Moreover, Officer Simmons had more than enough indicia of criminal activity to stop Beal's taxi, absent any traffic violation.  Through intercepted communications, agents knew Vaitaki Manoa, on behalf of a known narcotics trafficker with whom law enforcement had conducted several controlled buys, and another individual roughly matching Beal's description,[4] were to arrive in Dayton, Ohio on December 10, 2014 to exchange narcotics.  Agents surveilled Manoa and Beal as they arrived at and then left the Dayton International Airport.  Agents then intercepted communications—albeit none definitively from Beal[5]—that the two individuals in Dayton were trying to

---

[4]Beal makes much of the fact that some agents/officers recall that "Oso", one of the individuals who was to engage in the drug transaction, was reportedly wearing a red jacket that Beal was *not* wearing that night.  His focus on this discrepancy is misplaced.  The fact is that Beal was surveilled from the Dayton International Airport up to and during his meet up with Manoa.  The wiretap evidence conclusively established that Oso, whoever that was, was in a green Dodge minivan that would be meeting with Manoa at a specified location.  There is no dispute that Beal was in such a green Dodge minivan leaving the Dayton airport at the prescribed time and met with Manoa at the precise location and at the precise time that the wiretap indicated he would.  At that point, then, even if Beal did not perfectly match the physical description officers were given, law enforcement had more than enough information to conclude Beal was Oso, the second individual engaging in the drug transaction.

[5]This is another misplaced object of Beal's focus.  He appears to find it persuasive that law enforcement cannot definitively demonstrate that he communicated directly with Manoa on December 10, 2014.  But such evidence is not required.  That Beal attended the drug meet-up with Manoa and ended up in a taxi with a bag matching the description of a bag previously observed on Manoa's person is more than enough evidence to support probable cause.

meet to complete the drug exchange.  Agents surveilled Beal and Manoa up to and until they met together, whereupon Beal received a black backpack.

All of this information was relayed to Officer Simmons.  Further, she was provided the make and license plate number of the taxi that had just left the completed drug transaction.  Taken together, this information is far more than enough to give Officer Simmons probable cause to believe that Beal's taxi contained illegal narcotics.  Thus, even if she had not witnessed the vehicle commit a traffic violation, she lawfully stopped Beal's taxi.

Indeed, immediately upon stopping it, she could have searched the taxi and any container within it for narcotics.  *See California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.").  Nonetheless, Officer Simmons received even more evidence when she interviewed the taxi driver, who told her how Beal had directed him to drive to Manoa's hotel and how Beal had acquired the black backpack found in the rear passenger area after meeting with Manoa.  Even if Officer Simmons had only a reasonable suspicion that the taxi contained drugs upon pulling it over, she surely had probable cause at that point.

Contrary to Beal's position, this probable cause to believe the vehicle contained drugs was not eliminated by the failure of a drug-sniffing dog to alert

when conducting an open-air sniff around the vehicle.  Beal relies on *United States v. Davis*, 430 F.3d 345 (6th Cir. 2005) for the proposition that the failure of a drug-sniffing dog to alert to the presence of drugs dissipates the *probable cause* otherwise held by law enforcement to believe a vehicle contains drugs.  Dkt. No. 331 at 4.  Of course, this Court is not bound by the Sixth Circuit's *Davis* decision.  But even if it were, Beal's reliance on *Davis* is misplaced.  As another federal district court has explained:

> Defendants now contend that the negative dog sniff should have dispelled the officers' suspicions and ended the investigatory stop.  Defendants rely heavily on *United States v. Davis*, where the Sixth Circuit Court of Appeals held that an investigatory detention exceeded its scope when the suspect was further detained after a police dog failed to alert on his vehicle. 430 F.3d 345, 353-57 (6th Cir. 2005).  However, the court in *Davis* repeatedly emphasized that, at the time of the negative sniff, the police officers did not have probable cause to believe that the vehicle contained illegal contraband. *See id.* at 356 (recognizing that "an investigatory dog's failure to alert does not dispel probable cause"); *id.* at 357 (stating that delaying a suspect further after a dog has failed to alert is allowable only where probable cause exists).

*United States v. Valencia*, 2013 WL 12129375, at *3 (E.D. Wash. Feb. 14, 2013), *aff'd*, 584 F. App'x 488 (9th Cir. 2014).  The *Valencia* court held that because "police officers had probable cause to believe that the stopped truck contained illegal drugs" before the dog sniff of the vehicle, "[t]he negative dog sniffs that subsequently occurred did not destroy the probable cause that already had attached."  *Id.*  As explained above, the same is true here.

Moreover, even if probable cause was lacking with respect to the black backpack, Beal's motion to suppress would still fail because he lacks standing to challenge that search.  Beal was asked repeatedly which items in the taxi belonged to him, and he consistently responded that only the red Tommy Hilfiger bag was his.  Beal's argument that this response did not amount to abandonment of the black backpack is perplexing.  Beal points to no authority—and the Court finds none—requiring a suspect to affirmatively disclaim a piece of property before law enforcement may consider it abandoned.  Indeed, it would belie common sense to impose such a requirement.  Because Beal had no reasonable expectation of privacy in the black backpack when it was seized and searched by Officer Simmons, he lacks standing to challenge that search and seizure.  *See Paopao*, 469 F.3d at 764 (citing *Carter*, 525 U.S. at 88).  For this independent and sufficient reason, his motion to suppress the drug evidence found in the black backpack is DENIED.[6]

---

[6]Beal also argues that he has "automatic standing" because he is being charged with possession of the evidence he seeks to suppress. Dkt. No. 307-2 at 12 n.2 (citing *United States v. Haddad*, 558 F.2d 968, 974–75 (9th Cir. 1977)).  But this is no longer a recognized theory of standing in suppression proceedings.  *United States v. Salvucci*, 448 U.S. 83, 85 (1980) ("we hold that defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated.  The automatic standing rule of *Jones v. United States*, [362 U.S. 257 (1960), upon which *Haddad* relies, 558 F.2d at 974–75], is therefore overruled.").

## II.    <u>Beal's Statements to Law Enforcement are Admissible</u>

### A.    Statements made during the December 10, 2014 traffic stop prior to arrest

Beal was not in custody for *Miranda* purposes prior to the discovery of suspected narcotics and his arrest on December 10, 2014, even though he was asked to exit the taxi and briefly sit in the back of Officer Simmons' police vehicle. *See United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996). In *Torres-Sanchez*, the Ninth Circuit found that twenty minutes of questioning a suspect in the back of an officer's police vehicle did not constitute "custody" for *Miranda* purposes. *Id.* As the Circuit explained:

> In attempting to confirm or dispel his suspicions of illegal activity, [the Officer] used no threats of force, unnecessary delays, exaggerated displays of authority or other coercive tactics. *See United States v. Hickman*, 523 F.2d 323, 327 (9th Cir.1975), *cert. denied*, 423 U.S. 1050 (1976) (purpose of investigatory stop is to allow officer to confirm or dispel suspicions through reasonable questions); *United States v. Head*, 783 F.2d 1422, 1425 (9th Cir.), *cert. denied*, 476 U.S. 1171 (1986) (officer can continue to detain a defendant during investigatory stop when his suspicion is heightened, in order to deny or confirm suspicions). His purpose in questioning [the defendant] was to clear up appropriate questions about ownership of the truck. We have previously found no "arrest" in situations where far greater restraints have been placed on suspects during an investigatory stop. *See United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir.1990) (no arrest when defendant ordered out of car at gunpoint), *cert. denied*, 498 U.S. 1024 (1991); *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987) (no arrest when defendants "forced from their car and made to lie down on wet pavement at gunpoint"); *United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir.1983) (no arrest when suspect removed from car at gunpoint and ordered to prone-out on ground).

*Id*.

Officer Simmons' uncontested testimony is that she asked—not ordered—Beal to exit the taxi and sit in the back of her police vehicle.  He voluntarily complied.  There is no evidence in the record that Officer Simmons—or any other officer who later arrived at the scene—ever drew a gun or made any exaggerated show of authority.  Officer Simmons offered several explanations for asking Beal to exit the taxi: (1) Beal needed to exit the taxi so that the drug-sniffing dog could do its job unimpeded; and (2) she wanted to separate the driver and Beal to compare their versions of events leading up to the traffic stop and, in particular, to sort out ownership of the black backpack.  This latter explanation is precisely the rationale supported by the Ninth Circuit in *Torres-Sanchez*.  83 F.3d at 1128 ("separation of [the defendant] from the other occupants [of the vehicle], in order to compare their stories, was reasonable under the circumstance").

As discussed above, Officer Simmons was armed with information that indicated narcotics were somewhere in the taxi, likely in a black bag, and briefly detaining Beal—even in her police vehicle—to investigate that belief was reasonable under the circumstances.  While the Court acknowledges that Beal's movement during this inquiry was briefly curtailed, the circumstances do not amount to a finding that Beal was "in custody" for *Miranda* purposes until he was formally arrested and handcuffed once the narcotics were discovered.

Accordingly, any statements made to Officer Simmons during the investigatory stage on December 10, 2014 prior to formal arrest are admissible.

### B.    Statements made after arrest

Beal "disputes that he was informed of his right not to incriminate himself pursuant to *Miranda* at any point during the investigation and after being transported to OSHP offices on December 10, 2014." Dkt. No. 307-2 at 13. But he has offered no evidence to support this argument. The only relevant evidence in the record—the testimony of Officers Simmons and Beaty—indicates that Beal was advised of his *Miranda* rights upon arrest by Officer Simmons at the scene of the traffic stop. Officer Simmons' testimony on that point was very specific: she read Beal his rights from a *Miranda* rights card that she was provided by the Ohio State Highway Patrol and which she has used for that purpose since the inception of her law enforcement duties in approximately 2004. Shortly after his arrest and transport to the Highway Patrol station, Officer Beaty asked Beal if he had been advised of his rights and whether he understood them. Beal responded that "yes" he had been so advised and he "totally" understood his rights.

Given the short span of time between his arrest and questioning by Officer Beaty,[7] Officer Beaty was not required to re-*Mirandize* Beal. *Miranda* and its

---

[7]Though no precise time between arrest and interview can be gleaned from the record, Officer Beaty indicated she interviewed Beal the night he was arrested. Given that his taxi was stopped

progeny do not require a defendant to be re-advised of his rights prior to each new round of questioning.  Rather, to determine whether a defendant must be re-advised of his rights, this Court applies a totality of the circumstances test, focused particularly on whether intervening events may have given the impression that the defendant's rights had changed.  *See United States v. Rodriguez–Preciado*, 399 F.3d 1118, 1128 (9th Cir.2005) (collecting cases).

Here, Beal was read his *Miranda* rights upon arrest, transported to the station, and interviewed shortly after.  Under those circumstances, Officer Beaty was not required to re-advise Beal of his rights prior to interviewing him, particularly after he affirmed that he had received and understood them.  *See United States v. Contreras*, 2011 WL 1364969, at *4 (D. Ariz. Feb. 18, 2011), *report and recommendation adopted*, 2011 WL 995969 (D. Ariz. Mar. 20, 2011) ("The agents were not required to re-*Mirandize* [d]efendant simply because they transported him to the station"); *see also Rodriguez–Preciado,* 399 F.3d at 1127 ("Nor is it determinative that there was a change of one interrogator in conjunction with the change of location"); *Guam v. Dela Pena,* 72 F.3d 767, 770 (9th Cir.1995) (no need to re-*Mirandize* defendant where there was a fifteen-hour delay between *Miranda* warnings and interview); *Puplampu v. United States,* 422 F.2d 870 (9th

at around 10:00 p.m., no more than a few hours could have transpired between Beal's arrest and interview on December 10, 2014.

19

Cir.1970) (no need to do so after two-day delay).  Accordingly, because there was

no *Miranda* violation, all statements made during Beal's December 10, 2014

interview are admissible.

### C.      Statements made on September 25, 2019

Beal argues that his statements made to FBI Special Agent Rudow during

his September 25, 2019 interview must be suppressed because he was not

immediately read his *Miranda* rights at the start of the interview.  Dkt. No. 307-2

at 14–16.  That Beal was, roughly fifteen minutes into the interview, informed of

his rights and made a knowing and voluntary waiver of them prior to questioning

apparently does not, in Beal's view, cure this alleged defect.  *Id.*  The Supreme

Court, however, has expressly rejected this argument:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to
> administer the warnings, unaccompanied by any actual coercion or other
> circumstances calculated to undermine the suspect's ability to exercise his
> free will, so taints the investigatory process that a subsequent voluntary and
> informed waiver is ineffective for some indeterminate period.  Though
> *Miranda* requires that the unwarned admission must be suppressed, the
> admissibility of any subsequent statement should turn in these circumstances
> solely on whether it is knowingly and voluntarily made.

*Oregon v. Elstad*, 470 U.S. 298, 309 (1985).

Special Agent Rudow's interview of Beal was videotaped.  Special Agent

Rudow initially spoke at some length about the conduct of Beal's co-conspirators

generally, before focusing then on the evidence the Government had against Beal,

all prior to informing Beal of his *Miranda* rights and obtaining Beal's written

20

waiver.  *See* Dkt. No. 331-3 at 5–18.  As the Supreme Court has made clear, such

circumstances do not taint any statement made after Beal was informed of and

waived his rights.  The videotape of the September 2019 interview indicates that

when Beal tried to offer a response to the evidence presented, Special Agent

Rudow dutifully stopped him.  Gov. Exhibit 3 at 11:07; *see also* Dkt. No. 331-3 at

18.[8]  Special Agent Rudow then had Beal read his rights aloud, after which Beal

agreed verbally and in writing to waive those rights.  *See* Gov. Exhibit 2.

Accordingly, the Government may introduce any of Beal's statements made

thereafter, which is the point at which Special Agent Rudow began his

questioning.[9]

Beal argues that his statement to Special Agent Rudow during transport to

the U.S. Marshals Service offices after the September 25, 2019 interview

concluded should be suppressed "if [the statement was made] in response to a

question from law enforcement."  Dkt. No. 307-2 at 17.  There is no evidence,

however, that it was.  Special Agent Rudow's testimony—the only relevant

---

[8]The Court notes that where an interrogation is ongoing and law enforcement solicit incriminating statements prior to informing a suspect of his *Miranda* rights, the same statements made after *Miranda* warnings are given may be suppressed.  *Missouri v. Seibert*, 542 U.S. 600, 609–17 (2004).  That was simply not the case here, where Agent Rudow stopped Beal as soon as Beal attempted to offer a statement and ensured Beal knew and waived his *Miranda* rights before continuing.  *See* Gov. Exhibit 3 at 11:07.

[9]It is unclear whether Beal seeks to suppress any comment, partial or otherwise, that he made to Special Agent Rudow before his waiver of rights and before any actual questioning began.  If he does, this order is without prejudice to Beal specifically identifying the comment, the point at which it was made, and the basis for suppression.

evidence in the record—was unequivocal: Beal's potentially incriminating statement during transport was unsolicited.  Special Agent Rudow testified that he and Beal were discussing life in Phoenix, as Rudow had previously lived there before moving to Maui.  During a lull in the conversation, Beal asked if he could go in, tell "them" he messed up and start doing his time right away.  With this testimony as the only evidence on the issue, there is no doubt that Beal's volunteered statement is admissible against him.  *See Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); *United States v. Hudgens*, 798 F.2d 1234, 1237 (9th Cir. 1986) ("The fact that [the defendant's] voluntary statements were made in a police car does not render them inadmissible.").

## III.   <u>Severance is Warranted</u>

On May 18, 2020, Beal orally moved the Magistrate Judge to sever his case.  Dkt. No. 183.  The motion was denied.  *Id.*  On March 12, 2021, Beal moved the Magistrate Judge to reconsider that denial.  Dkt. No. 303.  After a hearing on Beal's reconsideration request, the Magistrate Judge denied it, explaining that "[i]n balancing the competing interests of Beal's right to a speedy trial, the vital role joint jury trials play in the criminal justice system, and inconvenience and cost to

the Government to separately try these joined charges, the court finds that Beal's joinder is not prejudicial under Rule 14(a)." Dkt. No. 312.

Beal appealed the Magistrate Judge's decision on April 6, 2021. Dkt. No. 316. Beal argues that his case should be severed for several reasons: (1) the COVID-19 pandemic has prevented and will continue to prevent this Court from holding multi-defendant trials into the foreseeable future; (2) delays due to issues unique to multi-defendant cases have and will continue to result in significant pretrial detention periods; (3) Beal's *significantly* limited alleged role in the conspiracy; and (4) trying Beal alone would not significantly prejudice the Government. Dkt. No. 316-2. The Court finds these latter three arguments persuasive.[10]

Federal Rule of Criminal Procedure 14(a) provides:

(a)    Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Trial in this case has been continued four times, twice over Beal's objection. Dkt. Nos. 100, 132, 136, 183, 283. Trial is currently set for June 21, 2021. Dkt. No.

---

[10]The Ninth Circuit has recently clarified that delaying trial due to the COVID-19 pandemic does not violate a defendant's Speedy Trial Act rights. *United States v. Olsen*, -- F.3d --, 2021 WL 1589359 (9th Cir. 2021).

283.  Beal has been in custody since his arrest for roughly 19 months and will likely remain in custody until trial.

"It is well established that an exclusion from the Speedy Trial clock for one defendant applies to all codefendants. . . . The attribution of delay to a codefendant, however, is limited by a reasonableness requirement." *United States vs. Messer*, 197 F.3d 330, 336 (9th Cir. 1999) (citation omitted).  While not related to a multi-defendant case, the Ninth Circuit's recent decision in *United States v. Torres*, -- F.3d --, 2021 WL 1589361, at *11 (9th Cir. 2021) is informative in determining when a delay in the trial of a defendant in custody is "reasonable."  In *Torres*, the Circuit explained that a 21-month pretrial detention was a "troubling length" that required "the district court [to] begin Torres's trial or reconsider bail . . . very soon." *Id*.

If Beal's case proceeds to trial in June 2021, he will have been detained for roughly 21 months pending trial, the same amount of time that concerned the Circuit in *Torres*.  *See id.*  And though the Court acknowledges that what is a reasonable pretrial detention length in a single defendant case, such as *Torres,* may differ from what is reasonable in a multi-defendant case, such as this one, it finds that the length of Beal's pretrial detention, in light of his limited role in the alleged conspiracy, warrants severance.

24

Beal is alleged to have received drugs from one co-conspirator on one occasion in December 2014.  Dkt. No. 319 at 4–12.  The Court expects that the evidence at trial will be limited and will be substantially similar to the evidence just received by the Court in a single morning in conjunction with Beal's suppression motion—the narcotics recovered and the testimony and related reports of federal and state law enforcement officers involved in surveillance, investigation, and arrest on and around December 10, 2014, Beal's December 10, 2014 interview by the Ohio State Highway Patrol, and Beal's subsequent interview on September 25, 2019 by the FBI.  Accordingly, the Court finds that prejudice to Beal in denying severance would be significant while prejudice to the Government in severing the trial will be manageable.  As a result, because justice requires severance, *see* Fed. R. Crim. P. 14(a), the Court hereby OVERRULES the order denying Beal's severance motion, Dkt. No. 312, and affirms that this case will proceed to trial against Defendant Beal alone, as scheduled on June 21, 2021.

## <u>CONCLUSION</u>

For the reasons set forth herein, Beal's motion to suppress evidence and statements, Dkt. No. 307, is DENIED.  Further, the Court OVERRULES the order denying severance, Dkt. No. 312, and SEVERS Beal's case for trial.  Absent any subsequent agreement by the parties, the Government and Beal are expected to proceed to trial on June 21, 2021.

IT IS SO ORDERED.

Dated: May 5, 2021 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

*United States of America v. Robert Darnell Beal*, Criminal No. 18-00070-DKW-12; **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND GRANTING DEFENDANT'S REQUEST FOR SEVERANCE.**